Filed 6/6/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CITY OF SAN JOSE, <br><br> Defendant and Appellant. <br><br> AFFORDABLE HOUSING NETWORK OF SANTA CLARA COUNTY, et al., <br><br> Interveners and Appellants. | H038563 <br> (Santa Clara County <br> Super. Ct. No. 1-10-CV167289) |

Respondent California Building Industry Association (CBIA) brought this action for declaratory and injunctive relief against the City of San Jose, the City Council, and the mayor (collectively, "the City") to invalidate the City's "Inclusionary Housing" ordinance on its face. The superior court granted the requested relief, on the ground that the City had failed to demonstrate a nexus between the challenged ordinance and the "deleterious public impacts of new residential development." The City appeals. Also separately appealing are several nonprofit entities that intervened in the action. We find the appellants' arguments to be well taken. Accordingly, we must reverse the judgment and remand the matter for further consideration.

*Background*

Repeatedly throughout Title 7 of the Government Code the Legislature has highlighted the "severe shortage of affordable housing" in this state, "especially for persons and families of low and moderate income." (Gov. Code, § 65913, subd. (a).)[1] In the Housing Accountability Act the Legislature stated that the lack of housing "is a critical problem that threatens the economic, environmental, and social quality of life in California." (§ 65589.5, subd. (a)(1).) The Legislature further recognized that "California housing has become the most expensive in the nation." (§ 65589.5, subd. (a)(2).)

Accordingly, the Legislature has expressly declared that the availability of housing for every Californian is "of vital statewide importance." (§ 65580.)[2] To that end, local governments are charged with the responsibility of facilitating the provision of housing for "all economic segments of the community." (*Ibid.*) Each locality, however, is acknowledged as "best capable of determining what efforts are required by it to

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] "The Legislature finds and declares as follows: [¶] (a) The availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian, including farmworkers, is a priority of the highest order. [¶] (b) The early attainment of this goal requires the cooperative participation of government and the private sector in an effort to expand housing opportunities and accommodate the housing needs of Californians of all economic levels. [¶] (c) The provision of housing affordable to low- and moderate-income households requires the cooperation of all levels of government. [¶] (d) Local and state governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community. [¶] (e) The Legislature recognizes that in carrying out this responsibility, each local government also has the responsibility to consider economic, environmental, and fiscal factors and community goals set forth in the general plan and to cooperate with other local governments and the state in addressing regional housing needs."

contribute to the attainment of the state housing goal," by addressing regional housing needs through the implementation of "housing elements" as part of the community's general plan. (§§ 65581, 65582.) Section 65583 delineates the components of those housing elements, including an assessment of housing needs for all income levels, the identification of adequate housing sites, and a program that assists in the development of such housing "to meet the needs of extremely low, very low, low-, and moderate-income households." (§ 65583, subd. (c)(2).) The housing element is presumptively valid. (§ 65589.3.)

The City's effort to implement the state's policy took the form of Ordinance No. 28689, the Inclusionary Housing Ordinance (IHO or the Ordinance), which the city council passed on January 12, 2010. In the measure, the city council cited its "legitimate interest" in alleviating the shortage of affordable housing in San Jose for "Very Low, Lower, and Moderate Income Households." The "Inclusionary Housing Requirement" of the new law called for residential developments of 20 or more units to set aside 15 percent for purchase at a below-market rate to households earning no more than 110 percent of the area median income, though the units could be sold to households earning at most 120 percent of the area median income.[3] The inclusionary housing requirement could also be satisfied by constructing affordable housing on a different site at specified percentages. However, incentives were available if the affordable units were constructed on the same site as the market-rate units.

---

[3] Nine percent of the total dwelling units were to be made available for rent by moderate-income households, and six percent to be available to "Very Low Income Households." "Moderate Income Household" for purposes of this provision was defined as a household earning no more than 80 percent of the area median income. "Very Low Income Household" was defined in the Ordinance by reference to Health & Safety Code section 50105. This provision, however, was to take effect only if *Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396 became "overturned, disapproved, or depublished by a court of competent jurisdiction or modified by the state legislature to authorize control of rents of Inclusionary Units."

The Ordinance provided an alternative to setting aside the "inclusionary units": developers could pay an "in-lieu fee."  The fee was not to exceed the difference between the median sale price of a market-rate unit in the prior 36 months and the cost of an "affordable housing" unit for a household earning no more than 110 percent of the area median income.  All in-lieu fees collected were destined for the Affordable Housing Fee Fund, to be used exclusively to provide affordable housing to the designated households.  The housing requirement could also be satisfied by dedication of land.  A "waiver, adjustment or reduction" provision allowed the developer to show, "based on substantial evidence, that there is no reasonable relationship between the impact of a proposed Residential Development and the requirements of this Chapter, or that applying the requirements of this Chapter would take property in violation of the United States or California Constitution."

Respondent CBIA filed its complaint on March 24, 2010, seeking declaratory and injunctive relief and a writ of mandate to set aside the Ordinance.  On May 9, 2011, two months before the July 11 trial, the court permitted a motion by several nonprofit entities and one individual to intervene in opposition to the complaint.[4]  In May 2012, after extensive briefing and oral argument revolving around a set of stipulated documents, the superior court granted the relief CBIA had sought.  In its July 11, 2012 judgment the court declared Ordinance No. 28689 invalid and enjoined the City from implementing it "unless and until the City of San Jose provides a legally sufficient evidentiary showing to demonstrate justification and reasonable relationships between such Inclusionary Housing Ordinance exactions and impacts caused by new residential development."  The City and Interveners separately filed timely notices of appeal.

---

[4]  The interveners were Affordable Housing Network of Santa Clara County, California Coalition for Rural Housing, Housing California, Non-Profit Housing Association of Northern California, Southern California Association of Non-Profit Housing, San Diego Housing Federation, and Janel Martinez.

*Discussion*

1. *Basis of the Relief Granted*

In its complaint CBIA alleged that the City had adopted the inclusionary housing requirements in the Ordinance "without demonstrating any reasonable relationship between the requirements imposed by the new Ordinance and any increased public needs for additional affordable housing caused by such new residential development or any reasonable basis for the allocation of the burdens and public costs of providing additional affordable housing to such new residential development subject to the Ordinance, and without substantial evidence in the public record purporting to demonstrate the necessary reasonable relationships to justify the IHO." These "actions," CBIA alleged, violated "controlling state and federal constitutional standards governing such exactions and conditions of development approval, and the requirements applicable to such housing exactions as set forth in *San Remo Hotel L.P. v. City & County of San Francisco* (2002) 27 Cal.4th 643 [*San Remo*], and *Building Industry Association of Central California v. City of Patterson* [(2009)] 171 Cal.App.4th 886."

In its trial brief CBIA elaborated on its position, contending that appellate precedent had established that "cities seeking to establish inclusionary housing mandates such as the IHO must—at least—provide an evidentiary showing that the fees and exactions to be imposed on new development are 'reasonably related' and limited to the city's reasonable costs of addressing 'the deleterious public impacts' caused by the new development." According to CBIA, the City had failed to show a "reasonable relationship between affordable housing exactions and demonstrable impacts of new development." The City Council staff reports endorsing the proposed ordinance lacked any "attempt to identify, much less to quantify, any 'deleterious public impacts' on City needs for affordable housing <u>caused by new market rate development</u>." The fixed percentages applicable to the set-aside requirements were "arbitrary" and the in-lieu fees

5

rested on a "house of cards." Because these deficiencies could not be cured, CBIA argued, the Ordinance was invalid on its face.

CBIA added that it had no quarrel with the legitimacy and importance of the City's objective of making affordable housing available in the community. It *repeatedly* emphasized that "this is not a takings case." Indeed, during the hearing counsel explained that a taking would arise if a developer could not build his project because of the City's permit conditions. But "[w]e don't get there because we're not looking at the impact on the individual developer." Even without such an *individual* impact, "there has to be a showing that it's related to some impact caused by the developer."

In defense of the IHO, the City posited two arguments: (1) CBIA's facial challenge could not succeed because CBIA could not show that the Ordinance could *never* be legally applied and (2) CBIA was misstating the law and relying on the wrong standard of judicial review. In the City's view, the Ordinance should be regarded as a land use restriction similar to a zoning regulation adopted pursuant to the local government's police power. It thus must be accorded a "highly deferential standard of judicial review" and must be upheld if it "merely has a reasonable relation to the public welfare." The Interveners more precisely argued that the Ordinance was reasonably related to the legitimate government *purpose* of creating affordable housing and therefore was within the City's police power. The Interveners also disputed CBIA's assertion that the inclusionary requirements were arbitrary, because it rested on "the false premise that inclusionary requirements are development fees or exactions." In any event, they argued, the percentage requirements were not arbitrary; they were based on "extensive stakeholder outreach and analysis" to ensure that its goal of producing new affordable housing could be reached without overburdening developers.

The superior court carefully considered the parties' respective arguments. In its ruling it stated at the outset that "[n]obody seriously disputes the proposition that the

6

South Bay Area is an expensive place in which to live." Nor was there any argument that "increasing the availability of affordable housing is a legitimate and important public policy objective" or that "inclusionary housing laws increase the availability of housing to people with lower incomes." The court ruled, however, that the City was obligated to demonstrate "its legal ability to require that a developer sell a home at a level which may be potentially below its costs in building that home."

After considering the parties' extensive arguments the court concluded that "the challenged portion of the ordinance bears no reasonable relationship to permissible outcomes in the generality or great majority of cases." [5] The court did not explain what outcomes would have been permissible, but it subsequently stated that the City had been unable "to demonstrate where in the record was there evidence demonstrating the constitutionally required reasonable relationships between deleterious public impacts of new residential development and the new requirements to build and to dedicate the affordable housing or pay the fees in lieu of such property conveyances." Thus, the City had "adopted this ordinance in derogation of controlling state law without providing any evidence purporting to meet the legal standards required."

2. *Standard of Review*

Because CBIA's action is a purely facial challenge, we address "only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084; *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 337.) The parties have posited different tests for facial invalidity, but we will apply the more lenient standard articulated in *San Remo*.

---

[5] The court also cited the takings clauses of the state and federal Constitutions (U.S. Const., art. V, Cal. Const., art. I, § 19) and section 66001 of the Mitigation Fee Act (Gov. Code, § 66000, et seq.); but its ruling appears to be based exclusively on *San Remo, supra,* 27 Cal.4th 643.

Accordingly, CBIA cannot succeed without a "minimum showing" that the ordinance is invalid "in the generality or great majority of cases." (*San Remo, supra,* 27 Cal.4th at p. 673, italics omitted.)[6] That burden remains a heavy one, however. "A claimant who advances a facial challenge faces an 'uphill battle.' [Citation.] ' "A claim that a regulation is *facially* invalid is [tenable only] if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties." ' [Citations.]" (*Home Builders Ass'n of Northern California v. City of Napa* (2001) 90 Cal.App.4th 188, 194.)

*3. The Parties' Positions on Appeal*

The City and Interveners restate the position they took below, characterizing the IHO as a land use regulation adopted pursuant to the City's police power. As such, Interveners argue, the Ordinance is valid if its terms are "reasonably related to purposes protecting or advancing the public welfare." The City adds that the Ordinance may not

---

[6] Our Supreme Court has also articulated a stricter standard: "[T]o support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181; accord, *Tobe v. City of Santa Ana*, *supra*, 9 Cal. 4th at p. 1084; *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267; see also *Sierra Club v. Napa County Bd. of Sup'rs* (2012) 205 Cal.App.4th 162, 172-173.) Under this more stringent standard, a plaintiff "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute." (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39; *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 347; *Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1535.) Instead, " 'the challenger must establish that no set of circumstances exists under which the Act would be valid.' [Citation.]" (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 278, conc. & dis. opn. of Cantil-Sakauye, C.J., quoting *United States v. Salerno* (1987) 481 U.S. 739, 745.) Were we to adhere to this stricter standard, we would entertain the City's assertion that the waiver provision of the Ordinance precludes a finding of facial invalidity.

8

be declared invalid unless it was "arbitrary, capricious, wholly lacking in evidentiary support, or [procedurally unlawful]." (See *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786.)

Both appellants rely primarily on *Home Builders Ass'n of Northern California v. City of Napa, supra,* 90 Cal.App.4th 188 (*Home Builders*). There the City of Napa passed an ordinance requiring 10 percent of new development units to be "affordable" as defined by the city, with alternative provisions for compliance, including off-site construction and an in-lieu fee. As in the instant case, the ordinance also offered benefits to developers for compliance and included a procedure for requesting an adjustment or waiver of the conditions.

The plaintiff builders' association sought invalidation of the Napa ordinance on its face, calling it an unconstitutional taking. The First District, Division 5, rejected this challenge, holding that the ordinance would increase the supply of low- and moderate-income housing and thereby " 'substantially advance' the important governmental interest of providing affordable housing for low[-] and moderate-income families." (*Id*. at p. 195.)[7]

CBIA responds that the IHO imposes an exaction which cannot withstand analysis under *San Remo, supra,* 27 Cal.4th 643 and *Building Industry Association of Central California v. City of Patterson, supra*, 171 Cal.App.4th 886 (*Patterson*). CBIA emphasizes that this is neither a zoning ordinance nor a regulation of the *use* of property; instead, it imposes a requirement that a developer seeking a permit "dedicate or convey property (new homes) for public purposes," or alternatively, pay a fee in lieu of "such

---

[7] CBIA contends that the City's reliance on *Home Builders* is misplaced, in part because the association had brought a facial *takings* claim. CBIA omits mentioning that *San Remo*, which it insists is the applicable authority in this case, was also a facial takings challenge.

compelled transfers of property."  It is "at its core" a dedication requirement which "clearly calls for the highest scrutiny."

This alternative portrayal of the inclusionary housing requirement misses the mark.  The IHO does not prescribe a dedication.  A "dedication" typically means "the transfer of an interest in real property to a public entity for the public's use."  (*Fogarty v. City of Chico* (2007) 148 Cal.App.4th 537, 543; cf. *Branciforte Heights, LLC v. City Of Santa Cruz* (2006) 138 Cal.App.4th 914, 927.)  " 'Dedication has been defined as an appropriation of land for some public use, made by the fee owner, and accepted by the public. By virtue of this offer which the fee owner has made, he is precluded from reasserting an exclusive right over the land now used for public purposes.' "  (*Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 820.)  "A dedication is said to have the characteristics of a contract, in that it requires both an offer and acceptance and is not binding until there has been an acceptance. [Citation.]  As in a contract, an expectation of performance is created—an expectation which in its barest essentials means that the land dedicated will be put to the use contemplated."  (*Clay v. City of Los Angeles* (1971) 21 Cal.App.3d 577, 583.)

Apparently retracting its own espousal of the "highest scrutiny" standard, CBIA nonetheless maintains, citing *San Remo*, that the City failed to provide "the required evidentiary justification" for the IHO by showing a reasonable relationship between the burden of the asserted "exaction" and "identified public needs or impacts created by the development."  We consider this argument first, as it was the one accepted by the trial court in its ruling.

The *San Remo* plaintiffs asserted a constitutional foundation in their complaint:  a *taking* in violation of the California Constitution.  (Cal. Const., art. I, § 19.)  Here, by contrast, CBIA continues to insist that this is *not* a takings case; indeed, it faults the City for seeking to "apply inapt 'regulatory takings' defenses and arguments to this case."

10

CBIA does not identify a specific constitutional infirmity or statutory violation. It nonetheless maintains that *San Remo* prescribes the required analysis.

We disagree. In *San Remo* the plaintiff hotel owners challenged a development impact "housing replacement" fee that was specifically designed to *mitigate* the loss of housing caused by the conversion of residential units to tourist use. (*San Remo*, *supra*, 27 Cal.4th at pp. 673, 671.) The fee was an alternative to replacement of the lost units with new residential units "comparable to those converted." (*Id*. at p. 651.) The focus of the Supreme Court's decision was the fee, not the housing replacement condition.

The "reasonable relationship" required by the Supreme Court in *San Remo* was between the development *mitigation fee* and the "deleterious public impact of the development." (*San Remo*, *supra*, 27 Cal.4th at p. 671.) Thus, it was appropriate to require a connection between the in-lieu fee and the loss of housing—that is, the "deleterious public impact" of the conversion. (*Ibid*.) Unlike the *mitigation* fee challenged in *San Remo*, the Ordinance at issue here does not appear to have been enacted for the purpose of mitigating housing loss *caused by* new residential development. Its express purposes were to "enhance the public welfare by establishing policies which require the development of housing affordable to households of very low, lower, and moderate incomes" and to promote the use of available land for those households, thereby alleviating the demand for affordable housing. Thus, whether the Ordinance was reasonably related to the deleterious impact of market-rate residential development in San Jose is the wrong question to ask in this case.

The Supreme Court also made it clear that it was not San Francisco's burden to make a showing of the requisite connection; it was the *plaintiffs'* obligation to show that the challenged fee provision was *not* reasonably related to housing loss through conversion. The plaintiffs failed to meet this burden. (*San Remo*, *supra*, 27 Cal.4th at p. 673; see also *Building Industry Assn of Cent. California v. County of Stanislaus* (2010) 190 Cal.App.4th 582, 591 [trial court improperly placed burden on county and Farm

11

Bureau to show facial validity of program designed to mitigate the loss of farmland resulting from residential development].)

CBIA also relies on *Patterson, supra*, 171 Cal.App.4th 886, but that case, too, is inapposite. The action in *Patterson* was brought by a developer who was subject to a development agreement that provided for an "affordable housing in-lieu fee." (*Id*. at p. 891.) The Fifth District applied the *San Remo* test to a provision in the development agreement that allowed the City to increase the in-lieu fee if "reasonably justified." (*Id*. at p. 889.) The appellate court interpreted "reasonably justified" to conform to the requirement of *San Remo* that the amount of the increase bear a reasonable relationship to the deleterious public impact of the Patterson Gardens development. (*Id*. at p. 898.) Notably, the city did not propose or advocate any different test. (*Ibid*.)

The *Patterson* court went on to find no connection between the amount of the increase and the "need for affordable housing associated with [the project.]" (*Id*. at p. 899.) The developer did not assert any facial invalidity of the fee, and thus did not assume the formidable burden encountered by those attacking legislation on its face, such as the plaintiffs in *San Remo*. (*Id*. at p. 898 & fn. 14.) Furthermore, the court did not analyze the issue by reference to the city's stated objectives, but focused instead on its method of calculating the revisions to the fee, in light of the terms providing for fee updates in the development agreement. (*Id*. at p. 895.)

CBIA cites a number of other decisions that have limited application to the facts presented here. *Bixel Associates v. City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1216, for example, involved a challenge to a fire hydrant fee which the plaintiffs alleged was a "special tax" in violation of the California Constitution. In *Ocean Harbor House Homeowners Assn v. California Coastal Commission* (2008) 163 Cal.App.4th 215 the plaintiff homeowners' association protested a fee the *purpose* of which was to mitigate the loss of an acre of beach resulting from the construction of a proposed seawall. This

12

court upheld the lower court's finding of a nexus between the Coastal Commission's fee condition and the "direct impact" of the seawall on recreational use. (*Id*. at p. 237.)

*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218 (*Shapell*) involved a school district's resolution authorizing a fee on new residential development to fund new school facilities. The developer sought a writ of mandate to invalidate the resolution on the ground that it was "arbitrary and capricious and without evidentiary support." (*Id*. at p. 228.) We held that while development fees were a valid exercise of police power, they could not exceed the cost of "increased services made necessary by virtue of the development." (*Id*. at p. 235.) The test we applied, however, was drawn from *California Hotel & Motel Assn v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212: "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute."

In *Shapell* the very purpose of the school facilities fee was to accommodate a growing student population and reduce overcrowding of schools *caused by* new development. The fee was improper to the extent that the assessment was based on an estimated increase in student population overall rather than on the increase generated by the new housing itself. We declined to second-guess the district's methods of deriving its supporting data, but we insisted that a "reasoned analysis" be conducted "to establish the requisite connection between the amount of the fee imposed and the burden created" by the development. (*Shapell, supra,* 1 Cal.App.4th at p. 235.) The district was required only to "make a reasonable choice after considering the relevant factors." (*Id*. at p. 237.) Thus, it had to "demonstrate that development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the influx of students are *reasonably based*." (*Id*. at p. 239, italics added.)

13

Also inapplicable is *City of Hollister v. McCullough* (1994) 26 Cal.App.4th 289, an eminent domain action involving a required dedication of a strip of the defendants' land for sewer and drainage improvements. The dedication requirement, we concluded, was not supported by evidence that it was reasonably related to the defendants' use of the property, or to any additional burdens on city services associated with the defendants' proposed subdivision; instead, it reflected an objective to promote "general municipal objectives." (*Id*. at p. 298.) In so holding we followed *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463, 1470, in which the Fifth District explained that dedications of property for public use must be reasonably related to the landowner's proposed use. If instead such conditions are "imposed by a public entity to shift the burden of providing the cost of a public benefit to one not responsible, or only remotely or speculatively benefiting from it, there is an unreasonable exercise of police power."

The parties are at odds over the significance of *Trinity Park, L.P. v. City of Sunnyvale* (2011) 193 Cal.App.4th 1014, where this court considered the issue of whether the below-market housing requirement imposed by the City of Sunnyvale was subject to the limitations period established in section 66020, subdivision (d)(2), of the Mitigation Fee Act, which applied to protests over "fees, dedications, reservations, or other exactions to be imposed on a development project." The city's below-market ordinance required Trinity Park to sell five houses in the subdivision at below-market prices as a condition of development approval. The parties agreed that this condition was not a fee, a dedication, or a reservation; their dispute was over the meaning of "other exaction." After examining the relevant Mitigation Fee Act provisions, we determined that the 180–day limitations period was intended to apply to "an exaction imposed for the purpose of 'defraying all or a portion of the cost of public facilities related to the development project.' " (*Id*. at p. 1035, quoting definition of "fee" in § 66000.) Applying this definition, we held that the challenged condition in Sunnyvale was not an "other exaction" within the meaning of section 66020, because neither the language of the

14

ordinance nor even the plaintiff's complaint indicated that the city's purpose was to defray all or a portion of the cost of public facilities related to the development project. (Cf. *Barratt American Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 696 [section 66020 applies only to development fees that "alleviate the effects of development on the community and does *not* include fees for specific regulations or services"]; but see *Williams Communications, LLC v. City of Riverside* (2003) 114 Cal.App.4th 642, 658-659 [charge imposed for license to install cable in city streets was "other exaction" within the meaning of sections 66020 and 66021].) It is unnecessary to compare *Trinity Park* with the instant case, as CBIA did not contest the Ordinance as an "other exaction" under the Mitigation Fee Act.

 *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 663 is also of no assistance to CBIA. That case involved primarily a takings challenge to an ordinance restricting property owners from evicting tenants to allow the owners to use the properties as a residence for themselves or their family members. The court held that the plaintiffs should have been permitted to prove that the restrictions did not "substantially advance legitimate state interests." (*Id*. at p. 663.) Although the United States Supreme Court later rejected this standard in regulatory takings cases (see *Lingle v. Chevron USA Inc.* (2004) 544 U.S. 528, 540-545 [125 S.Ct. 2074] (*Lingle*)),[8] the appellate court did not remove the burden from the *property owners* to make the requisite showing.

---

[8]  CBIA cites *Lingle* for the distinction between regulatory takings and land-use " 'exactions' cases such as this." That was not the comparison the high court delineated. *Lingle* explained that government regulation of private property will amount to a Fifth Amendment taking if it causes a "permanent physical invasion" of the owner's property or if the regulation completely deprives the owner of " '*all* economically beneficial us[e]' of the property." (*Id.* at p. 538.) If it does not fall within one of "these two relatively narrow categories," then the takings challenge is governed by *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 (98 S.Ct. 2646), which identified factors such as the economic impact of the regulation and the degree to which the regulation interfered with "investment-backed expectations." (*Id*. at p. 124.) Alternatively, a land-use

15

We thus conclude that the standard articulated in *San Remo* is inapplicable here, and that the Ordinance should be reviewed as an exercise of the City's police power. As we caution below, however, this does not entail unthinking acquiescence to the City's stated goals.

A local government's police power is derived from article XI, section 7 of the California Constitution, which provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." " 'We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state.' " (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151, quoting *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 782.)

"A land use ordinance is a valid exercise of the police power if it bears a substantial and reasonable relationship to the public welfare. [Citation.] It is invalid only if it is arbitrary, discriminatory, and [without a] reasonable relationship to a legitimate public interest." (*Arcadia Development Co. v. City of Morgan Hill, supra,* 197 Cal.App.4th at p.1536.) "The core issue is whether there is any rational reason related to

exaction can be a taking if it violates the standards set forth in *Nollan v. California Coastal Com'n* (1987) 483 U.S. 825 (107 S.Ct. 3141) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (114 S.Ct. 2309). In the course of its analysis, the court decided that the test for a regulatory taking -- whether the regulation substantially advances a legitimate state interest—is "doctrinally untenable" and "has no proper place in our takings jurisprudence." (*Lingle*, *supra*, 544 U.S. at pp. 544, 548, italics omitted.)

The case before us involves neither an asserted taking nor a land-use challenge governed by *Nollan* and *Dolan*. Our Supreme Court made it clear in *San Remo* that those cases "involved the government's exaction of an interest in specific real property, not simply the payment of a sum of money from any source available." (*San Remo, supra*, 27 Cal.4th at pp. 671-672.) Aside from an oblique suggestion that *Nollan* and *Dolan* are applicable by citing *Lingle*, CBIA does not attempt to reintroduce heightened scrutiny as a standard for measuring the City's regulation. Likewise, its new vague suggestion that due process is a ground for invalidation of a development exaction is of no consequence, as CBIA has not asserted any due process violation here.

the public welfare for the restriction imposed." (*Id.* at p. 1537; *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 607.) "In deciding whether a challenged ordinance reasonably relates to the public welfare, the courts recognize that such ordinances are presumed to be constitutional, and come before the court with every intendment in their favor." (*Associated Home Builders etc., Inc. v. City of Livermore, supra,* 18 Cal.3d at pp. 604-605.) Accordingly, a land use ordinance that is asserted to exceed a municipality's police power will withstand constitutional attack "if it is fairly debatable" that the ordinance "reasonably relates to the welfare of those whom it significantly affects," including the surrounding region if affected. (*Id.* at p. 606-607; see also *Arnel Development Co. v. City of Costa Mesa* (1981) 126 Cal.App.3d 330, 339 [applying *Associated Home Builders* to rezoning ordinance].)

Thus, a "[c]ity's exercise of its constitutionally derived police power is subject to substantial deference from the judicial branch." (*Arcadia Development Co. v. City of Morgan Hill, supra,* 197 Cal.App.4th at p. 1536.) Consistent with the presumption of constitutionality, a trial court reviewing a local government's legislative function "does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the local government. Rather, the court's authority is limited to determining whether the action was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Building Industry Assn. of Cent. California v. County of Stanislaus, supra,* 190 Cal.App.4th at pp. 589-590.) "The burden rests with the party challenging the constitutionality of an ordinance to present the evidence and documentation which the court will require in undertaking this constitutional analysis." (*Associated Home Builders etc. Inc. v. City of Livermore, supra,* 18 Cal.3d at p. 609.)

Nevertheless, as CBIA points out, a local government's police power is not unlimited. "[J]udicial deference is not judicial abdication. The ordinance must have a *real and substantial* relation to the public welfare," and "[t]here must be a reasonable

basis in fact, not in fancy, to support the legislative determination." (*Associated Home Builders etc. Inc. v. City of Livermore, supra,* 18 Cal.3d at p. 609*;* see also *City of Los Angeles v. County of Kern* (2013) 214 Cal.App.4th 394, 422.) "[W]here the exercise of that power results in consequences [that] are oppressive and unreasonable, courts do not hesitate to protect the rights of the property owner against the unlawful interference with his property. In other words, the governmental power is not unlimited, and a regulation of the use of property must rest upon a reasonable exercise of the police power. [Citation.] Legislatures may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities. [Citation.]" (*Skalko v. City of Sunnyvale* (1939) 14 Cal.2d 213, 215-216.) Accordingly, "[i]f, in the opinion of the court, a statute or ordinance purporting to be enacted to protect the public health, safety, morals, comfort, convenience or general welfare has no real or substantial relation to any of those objects, it is the duty of the court to so declare." (*McKay Jewelers v. Bowron* (1942) 19 Cal.2d 595, 600-601.)

To the extent that evidence supplied by CBIA is material and relevant to its attack on the Ordinance, the trial court is entitled to review it under the proper standard. We will therefore remand the matter for that purpose. We again emphasize, however, that it is *CBIA's* burden to establish the facial invalidity of the IHO, not the City's to prove that it survives the challenge. (Cf. *Building Industry Assn of Cent. California v. County of Stanislaus*, *supra*, 190 Cal.App.4th at p. 590 [party attacking the regulation must demonstrate its invalidity]; see also *Action Apartment Ass'n v. City of Santa Monica* (2008) 166 Cal.App.4th 456, 468 [party asserting facial takings claim must demonstrate that its "mere enactment constitutes a taking"].) We thus leave it to the superior court to determine whether CBIA has rebutted the presumption that the inclusionary housing conditions are reasonably related to the City's legitimate public purpose of ensuring an adequate supply of affordable housing in the community.

18

*Disposition*

The judgment is reversed, and the matter is remanded to permit the superior court to reconsider respondent CBIA's complaint in accordance with the appropriate legal standards. Costs on appeal are awarded to the City and Interveners.

_____

ELIA, J.

WE CONCUR:

_____

PREMO, Acting P. J.

_____

MÁRQUEZ, J.

*Cal. Bldg. Industry Assn. v. City of San Jose*

H038563

Trial Court:                          Santa Clara County Superior Court

Trial Judge:                          Hon. Socrates P. Manoukian

Attorneys for Defendants
  and Appellants:                     Berliner Cohen and
                                      Andrew L. Faber and
                                      Thomas P. Murphy and

                                      Richard Doyle,
                                      San Jose City Attorney,
                                      Nora Frimann,
                                      Assistant City Attorney and
                                      Margo Laskowska,
                                      Sr. Deputy City Attorney

Attorneys for Interveners
  and Appellants:                     Law Foundation of Silicon Valley Public
                                      Interest Law Firm and
                                      Kyra Kazantzis,
                                      James F. Zahradka II and
                                      Melissa A. Morris

                                      The Public Interest Law Project
                                      California Affordable Housing Law Project and
                                      Michael Rawson

                                      Wilson Sonsini Goodrich & Rosati and
                                      Colleen Bal and
                                      Corina I. Cacovean

                                      David Nefouse

Attorneys for Plaintiff
  and Respondent:                     Sheppard, Mullin, Richter & Hampton and
                                      David P. Lanferman and
                                      James G. Higgins